U.S. v. Herman Blanco, Zatola, and Ross, and I should note that Mr. Blanco's appeal is on submission, so that leaves Mr. Zatola and Mr. Ross' appeal for oral argument. Good morning, Your Honors. May I proceed? You may proceed, Counsel. Are you Mr. Greene, Attorney Greene? Theodore Greene for Anthony Zatola. You have reserved one minute for rebuttal. That's correct, Your Honor. Anthony Zatola's defense was that he was not involved in a defense. He sought to introduce evidence of a dispute that his father had over his illegal mafia-sponsored gambling enterprise, a dispute which escalated over a period of months that coincided with the escalating series of attacks on the father, Sylvester, and his son, Salvatore, both of whom were involved in the gambling enterprise. Mr. Zatola could not effectively present this defense because of an evidentiary ruling which was erroneous and overly restrictive that had to do with Mr. Zatola wanting to introduce a statement against penal interest that his father made in a proffer to the FBI when the FBI was trying to figure out who had these assaults on Sylvester and later his son. Now, what the jury heard was there were two such proffers, one July 12, 2018, and the other July 16. The jury heard only the July 12 statement buttressed by testimony from Salvatore. So, Counsel, because of the time limit, why don't we cut to the chase? And as I understand, one of the several evidentiary questions is the July 16 statement, proffer statement by Mr. Sylvester. My question is, when you compare the July 12 and the July 16 statements he gave to the FBI, there was a lot of overlap, and the court noted that, that they were very similar. The only distinction seemed to be that the July 16 statement contained additional information that Mr. Sylvester had stopped making protection payments to his mafia protector, Richard DeLuca, due to DeLuca's inability to protect his interests. But the fact that he was operating an illicit gambling business, that he had a conflict with the Albanian organized crime figures, all of those statements were in the July 12 that were admitted. So I'm trying to understand how the July 16 was not redundant, and how other than that one statement, which really is just a little bit more specific detail, precluded your client from arguing to the jury that it was not your client who committed or paid someone to commit the this murder and assault, but rather the Albanian or other organized crime? Sure, sure, Your Honor. Here's why the July 16 statement was materially different. What the jury heard, which is based on the July 12 statement and also some testimony from the son, is that the Albanians had muscled out Sylvester from one of his spots, and Sylvester was then ordered by high-ranking Bonanno member Vincent Daciano, who was giving orders from prison, to back off and let the Albanians take over the spot. So the July 12 statement that came in goes on to say that Sylvester contemplated suing the landlord to get back his property and then dropped it. So the narrative that the jury heard was that this dispute with the Albanian organized crime group rose up in the summer of 1917 and quickly died down and there was no follow-up. What the July 16 statement shows is that Sylvester did not quietly obey Vinny Daciano's order to back off from the Albanian encroachment. Instead, he went to another La Cosa Nostra member on the outside and wanted that LCN member to intercede on his behalf in the dispute with the Albanians. And that LCN, so he's disobeying Daciano's order by going to another LCN member and telling them he doesn't really want to go along with this business of backing off from the Albanian encroachments. I guess I'm looking at the two statements side by side. I don't see that in the July 16 statement. Did I miss it? That is greater detail that I'm not seeing, counsel. What I see as new are two sentences. Zatola then reached out to De Luca to peddle down the situation with the Albanians. De Luca, who Zatola faced protection money to, was unable to assist since the Albanians took control. But the mention of the Albanians was in the July 12 statement. And then the sort of last sentence, the last payment De Luca to De Luca was in the amount of $800 as two months ago Zatola stopped making protection payments to De Luca due to De Luca's inability to protect Zatola's gambling spots. Zatola makes a payment of $500-$600 a week to Baciano's wife, Angela. That seems to be what's new. So what statement are you claiming? But the part about Sylvester going to the LCN member, the other LCN member, not Baciano, to implore that, to try to get that person to, quote, settle down the situation with the Albanians, is not in the July 12 statement. And what it reflects is Sylvester's unwillingness to obey the order of Vinnie Baciano to allow, to cede this spot to the Albanians. And then the business about stopping the payments, that was in, that happened in the, he said that happened two months before the proffer, which would have been sometime in the spring of 2018. The reason he gave for withholding the protection, you know, was not because of the assaults per se, but because of their inability to protect his gambling spots. So what this statement shows is that this, his issue with the Albanians encroaching on him was ongoing, and it escalated to the point where he withheld protection. And the focus of his withholding protection was the inability to protect his gambling business. In other words, he's telling them, I want to keep committing crimes. I want your help, Mafia, in helping me to commit these crimes. And because you're not helping them, I'm going to pocket my proceeds for myself instead of giving you your share. I'm going to keep more of my illicit proceeds. So that is clearly a materially different statement that shows that this dispute didn't die down. And as late as the spring of 2018, it was still something that Zottola was concerned about to the point of their inability to protect his business, not himself. He's talking about running his business. And it escalated to the point where he withheld protection payments. And of course, shortly after that, his son was shot and wounded in the wake of that. And as I pointed out in the brief, Your Honor, the timing of all this in connection with the series of assaults is significant. The initial attack on Sylvester in September 2017 was not an attempt to murder him. It was an intimidation tactic where somebody approached him and punched him in the face. He was caught on a camera that Anthony Zottola could have disabled if he wanted to. You could see the guy's face perfectly. And then, so the initial encroachment is followed by this intimidation tactic. And then the withholding of protection. And I understand that's in your brief. So you're now about four minutes over time. I just want to make sure my colleagues don't have a question for you. But you have reserved one minute for rebuttal, counsel. Thank you. May it please the court, my name is Lawrence Gerzog and I represent Mr. Ross in the trial below. Our arguments, Your Honor, are basically true. There were two serious errors made by the district court that were so serious that they prejudiced the entire trial. Those errors were references to Mr. Ross belonging to a gang and the sequestration, partial sequestration, and anonymity of the jury. The term gang in and of itself suggests criminal activity. You don't say there's a gang of Boy Scouts. You don't say there's a gang of baseball players. There's a gang of criminals. No, I understand that. I thought the court gave some curative, the court didn't allow the government to reference which gang, the Bloods gang. And since this is a case involving organized crime, which one might argue is a type of gang activity or similar to that, and the defense was that it wasn't your client or Mr. Zatola, but rather the Albanian organized element or other organized members of organized mafia, how is it so detrimental for the jury to have heard an affiliation with a gang? I mean, this whole case was about organized crime and gang activity. Well, Your Honor, it's true that there was evidence about organized crime, that organized crime folks were not identified as being part of the gang. The word gang was used for Mr. Ross and his associates. But you would agree that most people would not view organized crime families, mafia families, to be Boy Scouts. Of course not. But similarly, Your Honor, I at least have never heard the mafia referred to as a gang. It's a family, it's this thing of ours, all those terms we see from the movies, but not a gang. And in Judge Deary, who was originally the judge, said that there was no real reason to use the word gang. Then the new judge who took over changed that ruling, but Judge Deary was correct. Judge Deary said there's nothing, there's no element of this case that is satisfied in any way by suggesting that this, that Mr. Ross was a member of a gang. Mr. Ross was hired allegedly by these folks to commit these crimes, but that had nothing to do. He didn't, they didn't hire the gang and then Mr. Ross was assigned by the boss to do the work. Mr. Ross was hired directly. In any event, Your Honors, the second point is the sequestration. The government argues that any prejudice was satisfied by the court saying that they were doing the sequestration and the anonymity to protect the jurors from having their privacy invaded by the press. Uh, what we can tell, however, is that that didn't wash. The jurors were not fooled. Juror number 58 during the jury process said, I don't want to be on this jury because it's about murder. They're going to murder me. Not, he didn't say, I'm worried about my privacy being invaded. And furthermore, don't they go hand in hand? Having tried many murder cases, it's not uncommon to hear discomfort from jurors on sitting on cases of that magnitude and having their names read out loud in the courtroom. That's not an uncommon expression from jurors. But this court's cases have said that the judge has to provide to the jury a plausible reason other than danger to create an anonymous jury. And the only reason that the judge gave was this protection from the news. Furthermore, once the trial started, every juror knew that this was a case about violence upon violence upon violence. Do you deny that there was jury attention, that this case drew wide jury attention? I don't. I mean, it depends on what you mean by wide jury attention. I mean, wide media attention. It did draw some press attention to be sure. But, you know, it wasn't the O.J. Simpson trial. I mean, it was, you know, a relatively controlled thing in a relatively small area among people that had no real newsworthiness to them. Of course, the press will jump on any violent case. What about the court's finding that the defendant's willingness to interfere with the judicial process both before and during the proceedings? Wouldn't that also be a basis for the court? Well, first, even if that's the case, it's my understanding of this court's cases that that plausible reason has to be given to the jury regardless of what the actual reason is. And furthermore, the government makes a big deal of this. Somehow, Mr. Ross and one of the cooperating witnesses were put in the same room, apparently by accident. And Mr. Ross allegedly said, you're a rat. I'm going to get you. I mean, this is two tough guys facing each other. I mean, that's not jury camp. Why wouldn't a judge reasonably assume that a case that involves a fratricide, attempted fratricide, parasite, would get considerable attention in the community and therefore assume that the jurors would consider it's a plausible explanation to say that if it gets a lot of attention, if it's notorious, it's customary to sequester. The fact that all the judge had to do for our law is to offer a plausible explanation. You're believe it. But not every plausible explanation is believed. If the explanation is plausible, why doesn't that satisfy our standard, whether or not an individual juror said, oh, my goodness, this involves the mob? Because I'm part sure that it really wasn't plausible. I mean, I understand your honest point that it's a bizarre case and the press would be interested. Any journalist would be. Of course. But it's also a very bloody case and a very violent case. And juror number 58, even before the jurors were seated, knew the real reason. And once the opening statements were made, every juror on that panel would know the real reason. And the plausibility of the press argument goes right out the window. That's my argument. That is just stops being plausible at that point. I have one minute. You have reserved one minute for rebuttal. Thank you, counsel. May it please the court. My name is Emily Dean. I'm an assistant United States attorney in the Eastern District of New York, and I represented the government in the district court. There are three reasons, your honors, that this conviction should be affirmed. First, the district court did not abuse its discretion with any of the evidentiary rulings or by impaneling an anonymous and partially sequestered jury. The district court did not make these rulings in an arbitrary or irrational fashion. Second, the court's instruction to the jury regarding cooperating witnesses and how to evaluate them was proper and tellingly neither argues there was a misstatement of law. And third, if this court were to find error in any of the rulings, it would be harmless due to the overwhelming evidence of guilt, indicating beyond a reasonable doubt that a rational jury would have returned a verdict of guilty, absent any alleged error. I'll get right to the issues that my colleagues raised and the arguments that you just heard. First, your honors, with respect to the preclusion of the portion of Sylvester Zatola's July 16th, 2018 proper protected statement, there was no abuse of discretion by excluding that very short portion of Sylvester Zatola's proper protected statement. First, there was no evidentiary basis on which to admit it. It was not a statement against the penal interest. Judge Kahn, you just flagged how narrow the overlap was in the precluded portion. And even that portion that you flagged with respect to the distinction in what came in from the July 12 statement to the July 16 statement, that portion that Sylvester stopped making payments to Ritchie DeLuca, I'll point you to Salvatore Zatola's testimony in government's appendix 98 where that fact came in. But this was not a statement against penal interest for Sylvester Zatola to say, I made protection payments and I stopped. That puts him, as the district court found, in the position of a victim, if anything. It does not expose him to criminal liability. Well, you understand how the defense thought that by getting that in, it would corroborate their defense that this wasn't, that they weren't involved in this murder, but rather it was the Albanian organized crime family or some other organized crime family within, you know, the mafia. I understand that. And I will note that they did separately get in the fact that Sylvester Zatola made protection payments through the testimony of Salvatore. But for this statement to come in, there had to be reason, some rule making it admissible. And there was not, because these statements taken one at a time, as this court ruled, we must in OJIDAN, they are not individually statements against penal interest. So the district court properly excluded it and there was certainly no abusive discretion. As to Zatola's argument that excluding this, which it was separately excludable on 403 grounds as well, the argument that excluding this prevented them from presenting their alternate perpetrator defense, it did not, your honors. They were permitted from start to finish of this trial to present that defense, but they had to do it within the bounds of the law. And Zatola has never in briefing or in the argument that just happened moments ago, articulated the probative value here with this specific statement that would make those parts of the statement admissible. Specifically that Sylvester Zatola went to Ricci DeLuca to settle down the situation. The arguments that were just made to this court were not based in the facts, not based in the record, that that meant Sylvester was flouting Vinni Baciano's order. That's simply nowhere either in this proffer statement or in any of the testimony. And Zatola was not precluded from making the argument, the alternate perpetrator argument. As this court has found in U.S. v. Hendricks, Diaz, and also Wade v. Mantello, there must be some evidentiary link between evidence and an alternate perpetrator in order for that to be admissible. That does not independently support admissibility here, and there was no abuse of discretion. If I may turn to Ross's argument. Let me ask you if you would spend a moment or two on the statement made by Zatola that was characterized as consciousness of guilt. When the police come for him, he says, I had a feeling you were coming. When? I didn't know. But since the investigation was going on for months, and he had retained counsel, and members of his family were being shot at right and left, why wouldn't it be perfectly sensible, why would it be consciousness of guilt to say, you know, I had a feeling the police were going to come and talk to me sooner or later? Well, your honor, your question actually hits exactly on the point as to why there wasn't abuse of discretion, because that would be a logical counter-argument to the government being permitted to offer it for consciousness of guilt. When the district court evaluated whether it was admissible for consciousness of guilt, he followed the standard laid out by this court in U.S. v. Perez, a 2004 case, looking at whether it was offered for a non-propensity purpose, whether it was relevant and more probative than prejudicial, and offered to provide a limit. It has to be more probative than prejudicial. I mean, if somebody is every month shooting at a member of your family, I don't see how it can be even probative to say I expected the police. How could the police conduct an investigation without coming by to see him? Well, your honor, Zatola was stating, I expected you were coming for me and I didn't know when, and I'm glad that you did it in this time frame. It allows the government to argue that there was a consciousness of guilt that Anthony Zatola knew the FBI was coming for him. Whether the defense could make the argument that you offer that there was another plausible reason, that goes to the fact that there was another plausible reason to offer to the jury, and the jury could accept or reject it. But that doesn't detract from the government's argument that it was highly probative that Anthony Zatola's reaction to the FBI coming was to tell them, I expected this. I knew that you were coming. Someone who was innocent of all wrongdoing would not be expecting the FBI to come for them and arrest them, your honor. The circumstances of this are key. This was immediately after his arrest. That's after he was arrested. That's not when they walked in the door. Correct. That's after he was arrested. Correct, your honor. It was in the precinct. So the circumstances are part of what make it compelling as far as the government's argument for consciousness of guilt. But your point that there is a plausible explanation, it undercuts the appellant's argument that there was nothing they could possibly offer to outweigh the prejudicial value of the statement. There were multiple plausible explanations that they could put to the jury, such as your honor's example. Well, the more plausible explanations they can offer, the less probative value the statement has. Yes, your honor. And respectfully, in the context of him being arrested and being brought back to the precinct, sitting down with the agent being processed to say to him, I knew you were coming. I knew this was going to happen. That goes directly to consciousness of guilt, your honor. And that is more probative than prejudicial. And your honor's point that there's... You're saying that's because it was after he was arrested, not after he first encountered the police at his home. That's right. That's right. And so, you know, if I may jump to harmless error, your honor, if there were to be a finding of error with that or any of the points, the evidence in this trial was so overwhelming as to guilt for both Ross and Zatola. I'd like to briefly touch on the evidence of each. For Ross, he was identified by a cooperating witness who committed the crime with him as a participant in the crime. He was on video, including on the day of the murder, committing the crime. Cell site location data put him at the scene of the murder, at the scene of Salvatore's non-fatal shooting, and at multiple other locations during the crime. DNA linked him to one of the attempts on Sylvester's life, and text message evidence between Ross and Shelton spelled out their plans to commit this crime. Turning to Zatola, in addition, Ross's social media showed him his newfound wealth immediately after the murder. Turning to Zatola, for 13 months, Zatola spelled out via text messages with Shelton, his plan to kill his father, providing Shelton with locations where his father would be and ways to access his father. Zatola's texts, photographs, and emails also spelled out proof of payment for this murder, including the work that he was doing on Shelton's home, including $200,000 and a box of water delivered to Shelton, and Zatola, his contact with Shelton at the MDC after Shelton was arrested for his father's murder, further showed how entrenched he was with this individual in the plan to kill his father. The motive was also compelling in this case. There was a mountain of evidence showing Anthony Zatola's attempt to take over the real estate business from his father. He was dead set on doing this, and Sylvester Zatola, while alive, he controlled the family's business. So if there were to be any error in any of the evidentiary rulings, which we submit there is not, we submit it should be harmless. Can I ask you a question about your opponent's argument relating to the use of the gang-related, and I understand, again, your argument would be the harmless, but they point to Judge Derry, who had indicated he would exclude any reference to gang at all. Now, I know the trial judge here said they could mention gang, but not which gang, not Bloods. Why wouldn't it have been sufficient to just say they recruited their friends? I understand your argument that it put in perspective why they recruited the people alleged attempts at Mr. Sylvester and his son's attacks and ultimately Mr. Sylvester's murder. In response to your question, I'd like to give a very concrete example of why that wouldn't suffice. Understanding the relationship of trust was key in this case, being able to explain that to the jury. For instance, there was testimony from a cooperating witness named Kalik McFarlane, who testified that after he was arrested, he encountered Ross. That was someone he did not know. Kalik McFarlane and Ross did not commit this crime physically together. When he encountered Ross, they learned that they were in the same gang. McFarlane said that created a camaraderie, and Ross made an admission to him about shooting Salvatore Zatola. He told him he shot the guy that was rolling on the floor, describing what Salvatore was doing on the video while he was being shot that the jury had seen. Without that understanding that they were in a gang together, with something more obtuse, it makes it less plausible, your honor, that Ross would just open up to this person who had been a virtual stranger. And that's exactly what this circuit's case law allows the government to do. In Pippala and in Reifler, the court held that evidence of criminals' prior involvement with each other, when offered to make the crimes or the explanation or mutual understanding of trust more plausible, is admissible. And I could give more examples like that if I had more time, your honor, but I see my time is up. Are there any other questions? If not, I'll sit down. Seeing none, thank you, counsel. Your honor, Salvatore testified about the stopping of protection payments, but his testimony was that those payments stopped in the wake of Salvatore himself being shot and wounded on July 11th, 2018. That is not what really happened. In the July 16th proffer statement that the defense was not able to get in, Salvatore made clear that the protection statements, the protection payments stopped two months prior to July. In other words, in the spring of 2018. And the reason for stopping the protection payments was not, obviously not because of the assault on his son, because that hadn't even happened yet, but the reason he gave was that they were, the LCN, was not protecting his gambling spots. And that is critical information that the jury never heard in support of the defense. Judge Jacobs had referred to the, I had an argument, mentioned this in my first opening argument, but Judge Jacobs had brought up the issue of the statement, the post-arrest statement that Anthony Isatola made. Now that statement was made after a month's long investigation where Anthony had hired a criminal defense lawyer to represent him in connection with the investigation. Everyone around him had been subpoenaed to the grand jury or interviewed, except him. So the argument is that Anthony had every reason to believe that he had been targeted. And so his statement, you know, I, you know, I was expecting you or I knew you, that carries, doesn't have probative weight and is far outweighed by the prejudice. And the problem for the defense is that it could not neutralize that statement without bringing out the prejudicial fact that Anthony was a target, which of course you would never want a jury to know. The motive for this offense, the alleged motive for this crime was weak as to Anthony Isatola. The government never articulated a coherent explanation for how Anthony Isatola was going to benefit by murdering his father or his brother. His father had transferred his large real estate assets to a trust, which was managed by an accountant and his sister. Thank you. Equal shares to everyone. Thank you, counsel. For the record, you're two minutes over your one minute rebuttal. We kept the government to its time, so, but I just wanted to make sure you had ample time to rebut. Your honors, the idea of harmless error is there was error, but there was a lot of other evidence, so forget about it. In that case, the government is essentially conceding that both of these things that I have complained about are error. Now it may be the case I could understand a ruling that said gang is in the light of all the other evidence, not something that is absolutely fatal. The jury business is fatal. The jury, sequestering the jury under this ridiculous, not plausible statement that we just don't want your privacy invaded when the jury was about to hear, you know, I think it's Judge Jacobson, this is bloody and, you know, this is really tabloid stuff. That can't be described as harmless in my view. Thank you. Thank you. Thank you, counsel. Thank you to both sides. The court will reserve decision on this matter. The next case up is U.S. versus Martin Mizrahi. May it please the court. My name is Chris Mann, and I represent Martin Mizrahi, who does not appeal his conviction, but he does challenge his sentence to the extent that it rests upon a judicial finding that he laundered drug money. The government's substantive and conspiracy to commit money laundering charges have a duplicity defect, and that they charge that each account was committed in three different ways through separate sets of transactions involving the proceeds of credit card fraud, bank fraud, and drug trafficking. The jury was told to convict if it found that any one of these three theories was proven, and the jury returned a general verdict. So we do not know which theory it accepted. Ordinarily, duplicitous charges are a concern to the defense because they create a risk that jurors may convict without being unanimous as to any particular crime that occurred. Judge Ed can solve that problem through unanimity instructions, and that's why Mr. Mizrahi does not challenge his convictions on appeal. Well, counsel, if the law is that you don't need a jury finding or a finding beyond a reasonable doubt for the factual predicate for forfeiture, does it matter that the forfeiture count here was not specific? In other words, whether it was from one of the two fraud schemes, from the wire fraud, bank fraud, or money laundering of narcotics. So if there's no jury finding, if we were to, well this court has found that in the Supreme Court, you're asking us to return this court's precedent, correct? On the Apprendi issue, we have been, but on the forfeiture issue, it's a statutory issue as well. Because under 18 U.S.C. section 982, the government has the burden of showing that any property they want to forfeit was involved in the alleged offense or involved in the offensive conviction. And here we don't know. Right, but I'm not asking about whether there is an adequate finding by a preponderance of the evidence. My question is, you have conceded, at least if I'm reading your argument correctly, that this court and the Supreme Court has held that there is no requirement that there be a jury finding or a finding beyond a reasonable doubt of the factual predicate for the forfeiture. Yes, as far as the Apprendi argument, the Supreme Court and this court, this court anyway has held, does not view Apprendi as being applicable. But all of the court precedents have always held that in order to get a forfeiture under section 982, the government has the burden of proving the property that they seek to have forfeited was involved in the offense. Right, the nexus, the nexus. But that doesn't need to be beyond a reasonable doubt, correct? Well, but the offense of conviction does. And so here, I think Mr. Klein will concede that if the government had solved this duplicity problem by, they charged three schemes in three different counts. They said count one, you laundered money from credit card fraud. Count two, bank fraud. Count three, drug trafficking. And if the jury had come back and said, convict on bank fraud, but acquit on drug trafficking, that cash money. He was never charged with actually dealing drugs. He was only charged with money laundering. And so the money laundering count encompassed the two substantive wire fraud, bank fraud counts, and then also charged that he, all the monies he laundered were both proceeds from the wire fraud, the bank fraud, and then narcotics trafficking. And I guess I'm not, I'm missing, help me understand your argument because you, I'm not quite following you. If you concede that the case law in the circuit in the Supreme Court is that there need not be a jury finding. Your Honor, I think we're sort of conflating two different issues. We agree on the apprendee question, but what we've still maintained is that the jury must find that the offense occurred. And we're talking about three different offenses in one. So you're saying in order to be found guilty of money laundering, proceeds of any particular offense, you have to also have committed the underlying offense? That's in essence what you're saying. No, no, no, Your Honor. Not at all. So what I'm saying is that, you know, Mr. Mizrahi received money from what the government called three buckets. He got credit card money, he got wire transfers from banks, and he got separate bulk cash that was used that the government claimed was drug trafficking money. If the jury found he took the wire fraud money and he laundered that, then the government can go enforcing forfeiture of that. But they can't say if the jury found he laundered bank fraud money, but he didn't launder the bulk cash as drug trafficking. They can't go after that money and say that's part of the same offense because it's not. But that's not what the law requires, counsel. And that's what I'm struggling with. And you've even conceived that. Unless, of course, we went on bonk to reverse it or the Supreme Court would. No, Your Honor. That's only on the apprendee issue. This is a separate issue. Under 982, it's got to be the property has to have the offense of conviction. So the question for you is what is the offense of conviction? And that tricky part here is that the government had three offenses rolled into one. And so just because they found that he laundered the wire, the bank fraud money, the money that came in by wire, that does not reflect a jury finding that he laundered the bulk cash. So they could seek forfeiture of the wire transfer money, but not of the bulk cash. And I think that would have been clear had they done the normal course and charged these money laundering schemes separately and said, you know, count one is bank fraud. He is laundering bank fraud money. Count two is laundering drug trafficking money. If they convicted on one and not the other, they couldn't seek forfeiture of the bulk. Counsel, counsel, how do you respond to there have been multiple cases and in 2007, Justice Sotomayor, now Justice Sotomayor, while sitting on this court, issued an opinion that states in essence, because criminal forfeiture does not implicate the Fifth and Sixth Amendments, a district court is only required to determine by a preponderance of the evidence, and she cited Capoce, the case of Capoce, whether the property subject to forfeiture bears the requisite nexus to the offense of conviction. Your Honor, Capoce is an excellent case for us because in that case, they actually struck, Justice Sotomayor struck down a forfeiture of money that was outside of the scheme. What she said, what the holding of the court in that case is, is when there is a conviction for a scheme, like if they had convicted of bank fraud or of credit card fraud, then it would be, it would allow the district court to consider how many credit card transactions were there, how many wires came in, and you could seek forfeiture of that. But here there's a separate scheme. So when it's, when it's property that's subject to forfeiture outside of the scheme of conviction, it doesn't count, which is why in that case, Justice Sotomayor eliminated certain funds that were like predated the alleged scheme. But here there are three schemes. The government always argued there were three schemes. They argued Mr. Mizrahi's involvement was that he laundered on the back end each of these three schemes. The problem is the court can't assume that because the jury was told you can convict on any one of these schemes, that it convicted on them all. So the jury, if the jury found that he laundered bank fraud money that came in by wire, that does not allow a forfeiture to be made for the bulk cash. It's separate money. And Mr. Mizrahi traded in bitcoin all the time, which is what this involved. And the bulk of the transactions the government doesn't contest were completely lawful. This is what he did. He was a bitcoin miner. He traded in it. Most of it is uncontested. Well, counsel, I think I understand what you're arguing to us. Unless there are further questions, you're now over time, but you have reserved two minutes for rebuttal. Thank you, Justice Sotomayor.  Good morning, Your Honors. May it please the court. My name is Ben Klein. I'm the Assistant United States Attorney. I represent the government in this appeal. I was also counsel for the government below. Let me jump directly into the court's questions about the scope of the forfeiture in this case. As the indictment reflects, Mizrahi was charged with engaging in a scheme with others to launder money from multiple different sources. Trial evidence showed that that was not the case. That's exactly what he was doing. He was working with the same co-conspirators to get money from multiple sources, including cash and wires, and he was using the same means and methods to turn that money into bitcoin, which he then sent to wallets that were supplied to him by the same co-conspirator. Based on this conduct, he was convicted of money laundering conspiracy as well as substantive money laundering. And once he was convicted, as Judge Kahn noted, it was then up to district court under this court's cases to determine whether the property that the government sought to forfeit had the requisite nexus to the underlying scope of conviction. The question was whether the duffel bags of cash that he was getting from a co-conspirator was connected to the money laundering scheme. On appeal, Mizrahi argues for the first time that the jury should have been required to make specific findings as to each of the underlying specified unlawful activities or SUAs. That is not required under the law. There is no federal crime of drug money laundering or of wire fraud money laundering. As a panel of this court, including Judge Kearse, found in the Stavroulakis case, the crime is money laundering. That's exactly what Mizrahi did here. He conspired with others to launder illegal money from multiple sources, and Judge finding that that cash was properly subject. In terms of the nexus that the court was required to find by a preponderance of the evidence, can you just briefly list what evidence the government is relying on that the court supported the court's finding by a preponderance of the evidence that Mr. Mizrahi that those funds that he trafficked, that he laundered relating to narcotics ties to, I believe, the bulk of the amount here? Of course, Your Honor. Two witnesses testified that the money had come from selling drugs and that Mizrahi was told about that, that he knew it. In talking about the source of the cash, one of the cooperating witnesses, Sevaid, specifically testified, this is available at Appendix 178, that a co-conspirator told him he was selling, quote, cocaine and he had rooms full of money. There were emails and texts with cartel associates. There was evidence about the use of a counter law enforcement measure involving a pre-selected bill during one of the cash pickups, which an expert testified is common to cartels. Coram, another co-conspirator testified, and this is available at Appendix 1092, about seeing a ticket that was issued to a cash courier whose money was seized by police and that, quote, the code and section related to seizures of money related to illicit drug or illegal activities. There's also significant evidence of threats of violence and actual violence. There's evidence that Mizrahi was told about these threats. There's a text message sent to Mizrahi. Is that when an associate of Mr. Mizrahi allegedly kept some of the proceeds and then the co-conspirator told him he would protect him from the cartel? That's exactly right, Your Honor. So the co-conspirator texted Mizrahi, and this was introduced at trial, that he had protected Mizrahi because these people wanted to come to his home and to his office. And as the court noted, one of Mizrahi's associates stole almost a half a He agreed to help collect that money, that he collected $380,000 in stolen cash, and that he kept that money. There was also the nature of the transactions themselves, which made no economic sense. There were multiple middlemen who were getting cuts of the money, driving it over to Mizrahi multiple times a week just to convert it into Bitcoin. Under any standard, these facts are more than sufficient to support the district court findings. Certainly taken together and viewed in the light most favorable to the government, as the court looks at it here, there is no clear error in the district court's findings. Unless the court has further questions, we would press on our submissions. Seeing none, thank you, counsel. Thank you, Your Honor. Attorney Mann, you have reserved two minutes for rebuttal. Yes, Judge Kahn. I want to return to the issue about what the nature of the offense is. As the Supreme Court noted in Mathis v. United States, you look at the fact that conviction has occurred, and that identifies what the conviction was for. But the underlying ways in which it was committed, that kind of forms out what the nature of the offense is. And here, the government alleged that this offense happened in any number of one of three ways. And we don't which one the jury accepted. If the jury found that all that Mr. Mizrahi did was receive the bank fraud proceeds, and he laundered that money from the wire transfers, it doesn't mean that everything that he ever did with buying Bitcoin is subject to the same offense. The jury could very well, in this case, have said, I do not believe that Mr. Mizrahi laundered drug money. I do believe that he committed laundered bank fraud money and convicted on that basis. And so for a judge to step in and say, no, no, no, what the jury really found, that the nature of this offense is, is that it included the drug trafficking, and I'm going to allow you to seek forfeiture of that as well, that usurps the role of the jury, both under the statute, under Section 982, that must look to what the nature of the offense was, but also usurps their Sixth Amendment function of allowing the jury to define what the crime is. And, Your Honor, that's separate from our Apprendi issue. Under this court's precedent, once they found a scheme, like if they found that he engaged in credit card, laundered credit card fraud money, the judge would be allowed to go through and parse out and calculate how many credit card transactions were actually laundered. And, and we argue under Apprendi that that has to be done by, by the jury, not the judge. But that's a separate question. We're addressing the first step. What was the offense of conviction? And we don't know whether it included drug trafficking, and I think that's fatal to the government's claim because it's their burden. And they normally address this in one of two ways. They could either charge a drug, money laundering via drug trafficking as its own count, in which case a conviction would say, yes, we found that that, that occurred, and any money involved in it can be forfeited. Or you would do it like a normal charge, where you go and ask for special interrogatory. Did you find that he committed money laundering by, laundering drug trafficking proceeds, etc. And they didn't do that, and that's not our burden. If they're going to want to go beyond the conviction and seek forfeiture of money, they need a jury finding that Mr. and Ms. Rahim laundered drug trafficking money, and they didn't ask for it, and we don't know. Thank you, counsel. Thank you to both sides. We'll reserve decision on this matter. The next matter on the docket is Derek Josie versus Correctional Officer Dustin Bell. Thank you. The appellant is presenting its case on submission. That was a late request received by the court yesterday, and I see Attorney Patrick Woods. The court received your response to the request, and you have 10 minutes, counsel. You may proceed. Thank you, Judge, and may it be so. In light of my opponent's submission and the very straightforward nature of the merits in this case, I'm not going to say more on the merits unless the court has questions related to some aspect of the merits. Otherwise, I primarily wanted to make sure I was here to answer any questions or concerns the court might have about the Supreme Court of the United States intervening decision in Purtube. The bottom line is twofold there. First, Purtube doesn't apply to the facts of this case. Purtube requires intertwinement between the merits facts and the facts related to exhaustion of administrative remedies. Here, there's no overlap between those two. The question of whether he was denied Ramadan services, the merits question is entirely separate from whether he was able to file grievances related to that question. So the court's long-standing rule in Mesa v. Gord that allows a hearing to be determined by a judge is the appropriate rule. And two, the court doesn't need to say anything about Purtube at all if it doesn't want to because it was never raised at any point by appellant here. There's never been any challenge to the propriety of holding the hearing in this case. And there have been multiple opportunities for appellant to do so even after Purtube was decided by the Supreme Court, was decided before the reply brief deadline. There was no reply brief. I submitted a 28-J letter on it. There was no response to that. And they're not here today. And in their submission last night or late yesterday afternoon, they indicated they didn't have anything to add to their briefing. I just have one question. I appreciate you did not file the blue brief, but it says at the bottom of eight, plaintiff appellant's arguments are reviewed for plain error. I'm not sure that's so. And who would be in a position to say? I mean, I would say that that plain error is not the correct standard. Clear error is the correct standard here. I don't have an explanation for my party opponents. It's not your brief. I just was wondering. No, it would be review for clear error of the district court's findings here. The factual findings. The factual findings. A de noble review of the grant of summary judgment. Correct. But the factual findings here were that he was not credible and there's nothing to support his side of his opposition to summary judgment on the exhaustion issue. The statement in the brief is that the arguments are to be reviewed for plain error. It doesn't focus on the findings. I don't know how you review arguments for plain error anyway. I don't have an answer for that one, Judge. Perhaps you can let the author of the brief know that you were asked this question by the court so that they can benefit from what you've had to respond. So I should be happy that he's not here. I would hope that he will also listen to the recording of the argument today. Thank you. Thank you, counsel. And thank you for attending today's argument. We will reserve a decision on this matter. And I believe the final matter for argument today is the matter of Marina Perez versus David C. Banks, New York City. Thank you. Good. It's still good morning, Attorney Moon. I'm sorry, Attorney Lancia. Nicole Lancia. May it please the court. Thank you. You have reserved two minutes for rebuttal. You may proceed. I represent the appellant, Marina Perez, on behalf of her child with disabilities, C.P. We are seeking a reversal of the district court's denial of the plaintiff's motion for summary judgment and ask that this court award C.P. compensatory education in the form of extended eligibility to receive special education services at I-BRAIN, the school that he attends, for four years until the age of 25. Now, the district court's decision was clearly erroneous for a few reasons. It was based entirely on a perceived non-existent agreement, lack thereof, between the impartial hearing officer's decision and the state review officer's decision. Essentially, the district court believes that by not addressing and not stating that there was no, that there was a gross violation of the IDEA, that they both had found that there was no gross violation of the IDEA. Do you concede that there needs to be a finding of a gross violation in order to award compensatory damages? No, Your Honor. Compensatory education services, compensatory education may be awarded where there is a gross violation, but my understanding of the case law is that where there is a denial of the fate, based on the state officers, such as the IHO's broad discretion in fashioning remedies, that compensatory education and or extended eligibility are appropriate remedies. What case do you have that stands for the proposition that you don't need a gross violation? Yes, Your Honor. I believe that was in, just looking at our brief. You can, you know, let us know on rebuttal. Let us know on rebuttal. I don't want to take your argument time. I do have one, two, hopefully quick questions, if I can ask them. Oh, in the case, well, it's under the statute, 1415 subsection I2C3, 34 CFR section 300, 516 C3, and also the school committee of the town of Burlington. But do you have a case that stands for the legal proposition that you don't need a gross violation? Oh, that you don't need a gross violation? Yes. I don't have a case that specifically states that. Okay. This case is heart-wrenching from, you know, any angle that you look at because of, you know, it's just incredibly difficult, I'm sure, for both sides. My, I have two very quick questions. One is, do you disagree that both, neither the hearing officer nor the SRO, the IO or the SRO, found a gross violation, explicitly found a gross violation? They did not find either way, whether there was or was not. That was not. There's no mention of a gross violation? Correct. I do have a question, just, and I, if I'm going outside of the record, please don't answer it. But it's my understanding that once an appeal is filed like this, there is an ability to have extended eligibility for I-BRAIN. So, has this appellant or the CP continued to receive services at I-BRAIN on an extended eligibility, either until the age of 23 or because there has been a, there's a term they call suspension or something like that. Can you? I'm actually not sure whether it was actually, whether it was ever implemented and that, whether the student has received the extra four years of extended eligibility. No, I'm asking whether he's currently there paid, but perhaps the Board of Education or the city can, can address that question. Sorry, go ahead. No, not a problem, Your Honor. Apologies, but I don't have that information. So, to, I believe, Your Honor's point, regardless of whether there was not a finding that there was no gross violation, under the standard of review, we would still submit that the district court clearly erred in one finding that there was some agreement between the two state officer, the state review officer and the IHO when there wasn't, and then blindly deferring to the SRO's decision, even though, one, it was not the decision and the conclusions that the district court made and then the SRO made were not matters of educational policy, so no deference was owed, but also the IHO's decision was the more well-reasoned decision and the court, if it was going to defer on any question, it should have deferred to the IHO's decision. Now, of course, Your Honors are aware that Your Honors review the record de novo and review the district court's factual findings for clear error, which we submit that that does exist here because, as Your Honor pointed out, there was no such agreement, there was no such finding either way as to a gross violation, and we submit that gross violation is not necessary, but I guess to that extent, if this court were to disagree and to say, yes, there must be a finding of a gross violation in order for the IHO, the SRO, or the district court to have been able to even fashion a remedy granting the plaintiff's request, then in the alternative, that issue should be remanded to the district court, who should then remand it to the IHO to actually address that issue specifically. For our purposes, is there a difference between compensatory education and extended eligibility? Yes, Your Honor. There is a distinction that we highlighted in our brief and I believe was addressed in the underlying decisions as well. Compensatory education services are the educational programs or services that can be provided to a student. Extended eligibility extends the school district's statutory obligations to provide special education to the student. It's an obligation to, on an annual basis, hold a CSE meeting and develop an individualized education plan for the student. They're separate in that regard. However, as was the case here by the IHO and what we're still requesting here in seeking the court's reversal of the Southern District's decision, extended eligibility for four years until the age of 25 may be a form of compensatory education, but those two terms could you address, please, the statute of limitations issue, which seems to be a matter of four days? Oh, is it?